IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 6, 2021

**CALVIN JONES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County
Nos. 11-06965, 12-01373   James M. Lammey, Judge**

_____

**No. W2020-00372-CCA-R3-PC**

_____

Calvin Jones, Petitioner, filed a pro se petition seeking post-conviction relief from his 2012 convictions for aggravated child abuse and first degree felony murder. Following an evidentiary hearing, the post-conviction court denied relief. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Joseph A. McClusky, Memphis, Tennessee, for the appellant, Calvin Jones.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Amy Weirich, District Attorney General; and Paul Goodman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Procedural and Factual History**

Petitioner was convicted by a jury in 2012 of aggravated child abuse and first degree felony murder of his two-year-old daughter and received an effective life sentence. This court affirmed the convictions on appeal, and the Tennessee Supreme Court denied further review. *State v. Calvin Jones*, No. W2013-00881-CCA-R3-CD, 2014 WL 3778511, at *1 (Tenn. Crim. App. July 31, 2014) *perm. app. denied* (Tenn. Nov. 20, 2014). We summarize the facts from this court's direct appeal opinion as follows:

On Friday, May 14, 2010, the day before the victim's death, the victim and her brothers were dropped off at daycare at 8:50 a.m. by their mother, Anisha Alford, and

picked up by Petitioner at 5:45 p.m. Two workers at the daycare center testified that the victim had not been sick that day or the week leading up to her death, acted normal at daycare, and played with the other children as she usually did. When the victim left the daycare center, she did not have anything wrong with her arm, she was not bleeding or clutching her stomach, she did not have any visible bruises, and she was not having any noticeable breathing problems. *Id.*

Ms. Alford testified that she "spoke to [Petitioner] after he picked up the children from daycare, and he informed her that the victim had soiled herself and had been acting up at daycare so he had 'popped her on her butt.'" Ms. Alford and Petitioner agreed to watch Barneka Lewis's son after daycare while Ms. Lewis was at work. Ms. Lewis dropped off her son at Petitioner's and Ms. Alford's apartment around 5:00 p.m. Ms. Alford testified that Petitioner picked her up from work around 8:00 p.m. Petitioner said that he was late because "the victim had soiled herself again and he had to 'clean that sh-t up.'" Ms. Alford "noticed that the victim was 'kind of slump[ed] down in the backseat' and spit up on herself as they were driving." When they arrived at their apartment, Ms. Alford told the victim that she could go lie down. "A short time later, Ms. Alford checked on the victim and observed that the victim was 'breathing funny' and was cool to the touch." *Id.* When Ms. Lewis returned around 11:00 p.m. to pick up her son, Ms. Alford met her at the door holding the victim in her arms. "Ms. Lewis testified that the victim was cold to the touch, had a 'knot' on her back, and had a bruise on her face." The victim had difficulty breathing and vomited a clear liquid. *Id.* "Ms. Lewis offered to watch the other children so that Ms. Alford and [Petitioner] could take the victim to the hospital. She testified that Ms. Alford initially accepted her offer but changed her mind after talking with [Petitioner]."

After Ms. Lewis left, Ms. Alford made a pallet for the victim in the master bedroom where she and Petitioner slept so that she could "keep an eye on [the victim]." When Ms. Alford awoke in the morning, she noticed that the victim was not on her pallet. Ms. Alford found the victim lying on the floor in her sons' bedroom. When she picked the victim up, she "realized the victim was dead and started screaming." After calling 911, Ms. Alford "ran outside screaming that something was wrong with her baby[,]" and a neighbor who was a nurse attempted to perform CPR on the victim. The police and paramedics arrived soon after and declared the victim dead at the scene. *Id.* at *3

The victim's older brother testified that they went to daycare the day before the victim died. He "recalled that the victim got into trouble with [Petitioner] for soiling her pants and that [Petitioner] 'whooped [the victim].'" He said that, during the car ride to pick up his mother, he saw the victim vomit and saw blood on her lip. He denied that he or his mother hurt the victim that night. *Id.* at *4.

Dr. James Caruso, a forensic pathologist, performed the victim's autopsy on May 15, 2010. He observed "a contusion on her forehead, several contusions and abrasions on her face and neck, and a contusion on her lower lip that was 'certainly caused by blunt force.'" Additionally, he found evidence of a non-life-threatening brain injury; a fracture to the victim's left forearm; several rib fractures that "were definitely old and healed" and others that were fairly new, hemorrhaging, and had not yet healed; and a number of contusions and abrasions on her chest, evidencing blunt force injury. The victim "also had a laceration of her liver caused by a blunt force injury that likely 'occurred as a result of the compressive force applied to the ribs'" and "a contusion on the victim's bowel." Dr. Caruso opined that the victim was suffering from peritonitis, an infection or inflammation of the body cavity that holds the intestine. He said that peritonitis is usually caused by bacteria in the bowel leaking into the area surrounding the bowel and that it is a "life-threatening medical condition that requires immediate medical attention." *Id.* Dr. Caruso "found hemorrhage or blood in the fat tissue under the skin covering the buttocks, which confirmed that the victim had deep contusions on the buttocks that were sustained 'relatively recent[ly]'" from a "blunt force [that] had been applied to her buttocks area[.]" Dr. Caruso concluded that the victim's cause of death was multiple blunt force injuries and that the manner of death was homicide. "He further explained that the victim's injuries suggest[ed] that 'the force was applied at a time when [the victim] could not move freely in reaction to that force' and agreed that it could have resulted from multiple hits or kicks delivered while the victim was lying on the floor." *Id.* at *5.

Sergeant Connie Justice of the Memphis Police Department ("MPD") explained that, prior to receiving the results of the autopsy, she "received information from the medical examiner that there was evidence of possible abuse on the victim" and, as a result, "shifted her investigation from a death investigation to a homicide investigation." Sergeant Justice asked Ms. Alford and Petitioner to come to the police station to discuss the victim's death. They arrived at the police station at approximately 3:30 p.m. on May 15, 2010. Sergeant Justice advised Ms. Alford and Petitioner of their rights, and each signed an advice of rights form. Petitioner initially told Sergeant Justice "that the daycare staff told him that the victim had been sick at daycare, vomiting and having diarrhea." Petitioner said that the victim ate a hotdog and threw up and that the victim vomited again as they were leaving to pick up Ms. Alford from work. Petitioner stated "that when they arrived home, the victim walked 'real, real slow[ly]' back to the apartment and fell about three times." Petitioner claimed that the victim was only "acting" to get attention from her mother. Petitioner said that Ms. Lewis came to the apartment later that evening and offered to stay with the other children while Petitioner and Ms. Alford took the victim to the hospital. Petitioner stated that he believed there was "not a need." He said that the victim lay down on her pallet around 2:00 a.m. He said that he "woke around 7:00 a.m. the next morning, and he and Ms. Alford found the victim deceased in another room." *Id.* at *6.

- 3 -

"[Petitioner] denied physically disciplining the victim on May 14, 2010. He said that he sometimes disciplined the victim "by spanking her with a brush or his hand or 'pop[ping]' her with a shoe on her leg or chest" and "that occasionally he accidently hit the victim in the stomach because she was 'flailing around' trying to avoid his hits." He claimed that the victim got the "bump" on her forearm and upper back "from falling" and that she got the "bruise on her forehead when she fell and hit her head on the commode." Based on the information Petitioner provided about disciplining the victim, Sergeant Justice placed Petitioner under arrest. At that time, he was handcuffed, and his leg was shackled to the bench in the interview room. "Sergeant Justice then reduced [Petitioner]'s oral statement to writing, but [Petitioner] did not sign that statement." *Id.* at *7.

MPD Sergeant Kevin Lundy interviewed Petitioner. Sergeant Lundy said that Petitioner gave "several explanations for the victim's injuries, including that the victim was clumsy and that the injuries occurred while she was at daycare." When Sergeant Lundy confronted Petitioner with the "inconsistencies," Petitioner admitted "that he spanked the victim because she had defecated on the bathroom floor." Petitioner then said that "he held the victim down on the ground and hit her repeatedly with an open hand, a fist, and a tennis shoe" and that the victim "tried to flee" but was unable to do so. "[Petitioner] demonstrated for Sergeant Lundy how he hit the victim and stated that he hit her approximately thirteen or fourteen times." Petitioner said that he told Ms. Alford "that he spanked the victim, after which the victim began acting unresponsive and disoriented." *Id.*

Over the objection of Petitioner, Dr. Karen Lakin was certified as an expert in the field of child abuse pediatrics. She testified that "she reviewed the victim's autopsy report and photographs; Ms. Alford's and Ms. Lewis's statements; the pre-hospital report by the paramedics; and the supplemental reports of the two investigating officers, which included the initial statement given by [Petitioner]." She stated "that peritonitis is a life-threatening condition, requiring medical treatment" and that "[n]oticeable symptoms include fever, chills, lethargy, severe abdominal pain, lack of appetite, and diarrhea." She opined that all of the victim's injuries were "very traumatic" and "severe injuries" and that the victim's peritonitis and other internal injuries were "very painful." "Dr. Lakin discounted other causes for the victim's injuries such as spanking, playing with other children, bumping into furniture, and being anemic." She testified "that the victim's injuries were consistent with [Petitioner]'s statement to Sergeant Lundy that he repeatedly struck the victim with his fist and a shoe." *Id.* at *8.

Petitioner testified about the events leading up to the victim's death. He "acknowledged that he read and signed an 'Advice of Rights' form but claimed that he was told that he had to sign the form in order to hear the results of the victim's autopsy report." He claimed that, after Sergeant Justice left the interview, "two other officers came in and 'started hollering at [him] and hitting the table' and then shackled [Petitioner] to the

bench." He claimed that the officers told him "if [he] would 'just lie' and admit to it he would only be charged with manslaughter." Petitioner said "that he initially agreed to 'lie' and say he hit the victim repeatedly with a shoe[.]" He said that he then "told the officers he would not admit to hitting the victim and would not sign a document to that effect." Petitioner denied that "he hit or slapped the victim and denied that he told the interviewing officers that he did." Petitioner "agreed that the victim suffered a 'brutal beating' on the night of her death" but "maintained that it must have occurred while he was asleep." "He suggested that Ms. Alford took the victim outside during the night and beat her while he was asleep." *Id.* at *9.

## Petition for Post-Conviction Relief

On October 6, 2015, Petitioner filed a timely pro se post-conviction relief petition claiming that he received ineffective assistance of counsel because trial counsel: (1) failed to request and present a medical expert; (2) failed to investigate or obtain the assistance of an investigator and failed to interview the State's witnesses; and (3) failed to file a pretrial motion to suppress Petitioner's statement to police. Petitioner also claimed that he was entitled to relief because the cumulative effect of trial counsel's errors deprived him of a fair trial. The judge who presided over Petitioner's jury trial recused herself from the post-conviction case, and the case was reassigned. Counsel was appointed, but after Petitioner hired private counsel, appointed counsel withdrew. The record on appeal does not contain an amended petition, nor does Petitioner's brief mention an amended petition.

## Issues Preserved on Appeal

Although Petitioner raised three claims of ineffective assistance of counsel and one claim of cumulative error in his pro se petition for post-conviction relief, Petitioner on appeal abandons those claims and instead raises two claims of ineffective assistance of counsel that were not raised in his pro se petition: (1) trial counsel failed to adequately meet with Petitioner prior to trial, and (2) trial counsel fell asleep during trial.

Before any proof was presented at the post-conviction hearing, the post-conviction court asked, "[W]hat are the issues that you'd like to pursue in this post-conviction?" Post-conviction counsel answered:

> [Petitioner] is alleging that he did not get the complete attention of his trial attorney. I think he would like a chance to further outline kind of what he sees as some of the deficiencies.

He doesn't feel that he and [trial counsel] met enough to discuss the case and that he was not really aware of what the trial strategy was when the trial came up is the gist of it.

The post-conviction court allowed testimony and argument concerning whether trial counsel adequately met with Petitioner and whether trial counsel fell asleep during trial and decided those claims without objection from the State. "Tennessee appellate courts may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020). Because post-conviction counsel argued at the post-conviction hearing the two claims that Petitioner raises on appeal, we will consider the claims but limit our discussion of the evidence presented at the post-conviction hearing to that which is germane to those two claims.

## Post-Conviction Relief Hearing

Petitioner testified that his family hired trial counsel before his preliminary hearing. He said that he was incarcerated for a "little bit over two years" before his trial and that trial counsel came to the jail to see him only one time, two days before trial. He said that trial counsel asked to hear his side of the story. He testified, "While I was explaining to him my side he was asleep." He said that trial counsel was sitting down "with his head slump[ed] over [a]sleep" and that he had to call trial counsel's name to wake him up. Petitioner was then asked, "[W]hen you were telling him what happened you gave him all of your version of events, right?" Petitioner answered, "Yeah."

During cross-examination, Petitioner recognized and pointed to an attorney from trial counsel's firm who assisted trial counsel in the case ("co-counsel"). Petitioner said that he met co-counsel on the first day of trial. Petitioner agreed that he had at least twenty appearances in court between the time of arraignment and trial but maintained that he only talked with trial counsel during one of his court appearances. He said that, on one occasion, trial counsel "mentioned about a preliminary hearing. That[] was it or a change of venue or something."

Petitioner said that, at the request of trial counsel he wrote out his "side of the story[,]" but he claimed that the trial had already begun when he did so. He admitted that he never complained to the trial court about trial counsel. He then stated that he asked his mother to hire another lawyer.

Co-counsel testified that trial counsel passed away before the post-conviction hearing. Co-counsel testified that he had been practicing criminal law in Shelby County since 2000. He said that he started working at trial counsel's firm on February 1, 2001,

and had been with the firm for approximately twelve years when Petitioner's case was tried. He agreed that trial counsel represented a "considerable" number of clients in criminal court. Co-counsel assisted trial counsel with "every step" during Petitioner's trial but was not involved in all of the pretrial matters. Concerning Petitioner's claim that trial counsel did not talk to Petitioner during the numerous court settings, co-counsel said that, "having practiced law with [trial counsel] for almost [twenty] years[,] I would say that would be very outside the normal course of business for him."

Co-counsel said that, in his opinion, the "proof against [Petitioner] was overwhelming. And it was[n]'t any one thing. There was a combination of things." He explained that the medical evidence and Petitioner's statement to police were, "from a defense standpoint[,] devastating." Co-counsel explained that, in his pretrial statement, Petitioner admitted to "[thirteen] or [fourteen] different blows being administered by a grown man to a two-year-old child, who I assume weighed thirty pounds, forty pounds at the time[,] over potty training."

On cross-examination, co-counsel explained that he and trial counsel met with Petitioner concerning Petitioner's right to testify and that Petitioner chose to testify. On examination by the post-conviction court, co-counsel said that he had tried approximately fifteen or twenty cases with trial counsel. He said that trial counsel retired in 2015 and passed away in 2019. The following dialogue then took place:

THE COURT: Okay. And I guess what I am getting to is I mean, you've seen him in action?

CO-COUNSEL: I have.

THE COURT: It's fair to say he had a very quick mind and very observant?

CO-COUNSEL: Very quick mind. . . .

THE COURT: At the time of this trial do you recall whether or not he had that same MOJO or whatever?

CO-COUNSEL: I believe he did. You know, no one wants to believe that when you see a case [like] this and it's presented to you, you know, obviously you want to look for any other explanation because you don't want to believe, no one does, that that's how a two-year-old died.

. . . .

- 7 -

THE COURT: Going back to [trial counsel]. I just [watched] the old TV show Columbo where he would ba[i]t you into thinking that he's incompetent and all of a sudden[,] he slammed you. Isn't that the way [trial counsel] worked?

CO-COUNSEL: Well, that's not the first time I've heard that analogy.

THE COURT: That's what I think of. Cause he was that way.

CO-COUNSEL: Yeah. His own son.

THE COURT: Tore them to shreds [and] didn't know they got ripped.

CO-COUNSEL: Yeah. His own son made that analogy from time to time.

THE COURT: Okay.

CO-COUNSEL: I didn't – there wasn't any point, to me, in the trial that I felt that [trial counsel] was incapable of meeting [Petitioner's] defense needs. And I can't --

THE COURT: You didn't feel like you had to step in and help or takeover.

CO-COUNSEL: No.[1]

Phyllis Grandurson, Petitioner's mother, testified that she hired trial counsel to represent her son. She said that Petitioner wanted to hire different counsel, so she called another firm which she could not afford because she "had spent all her money" to hire trial counsel. She said that trial counsel would "nod off" during court and that she thought trial counsel "had gotten too old to handle a case like" Petitioner's. On cross-examination, Ms. Grandurson agreed that she met with trial counsel on multiple occasions and with co-counsel a couple of times.

---

[1] This line of questioning by the post-conviction court, especially questions in which the court expresses its opinion or leads a witness with a question that basically provides the answer, raises to some extent the appearance of bias. "Tennessee litigants are entitled to have cases resolved by fair and impartial judges." *Cook v. State*, 606 S.W.3d 247, 253 (Tenn. 2020). It is the responsibility of the State, not the court, to illicit testimony concerning trial counsel and the representation provided by trial counsel. When the State fails to do so, the court should proceed carefully in questioning witnesses and should avoid offering its opinion as to the evidence. However, Petitioner did not move for recusal of the post-conviction judge, and the scope of the questioning did not rise to the level to require post-conviction judge to recuse himself *sua sponte*. *See id.* at 254.

**Post-Conviction Court's Oral Ruling**

Following argument, the post-conviction court announced its ruling concerning the ineffective assistance of counsel claims. Although the post-conviction court addressed all of the claims argued at the post-conviction hearing, we will limit our discussion to its ruling on the claims raised on appeal.

*Failure to Adequately Prepare Petitioner for Trial*

Concerning Petitioner's claim that trial counsel only met with him once at the jail, the post-conviction court stated:

> And I can't imagine being confronted with this proof that [trial counsel] was confronted with how anyone could have done any better defense. I mean, what would you have talked about? Let's say he went to [see] him a hundred times what would you have talked about?
>
> . . . .
>
> I just don't know what [Petitioner] wanted [trial counsel] to come talk to him about. There was no testimony about that. ["]He should have talked to me about X, he should have talked to me about Y, should have talked to me about Z.["]
>
> . . . .
>
> Sure, I guess it would have been nice to have him come by and talk to him every day. About what I don't know. I'm not sure what good that would have done. I don't see any deficient performance.
>
> So, since I don't see any deficient performance there can't be any prejudice.

*Trial Counsel's Falling Asleep*

Concerning Petitioner's claim that trial counsel fell asleep when they met at the jail and during the trial, the court stated:

> So I suppose, you know, would have, should have, could have. [] I don't see how it would change the outcome of the trial at all. Heck, if [trial counsel] slept all the way through the trial[,] I don't know how that would

you know, I'm sure that there would have been some notation of that by the [trial j]udge, you know. Of course, you know, we're talking about ineffective assistance of counsel in having a good defense team. But, assuming, just assuming he slept through the whole thing you still had [co-counsel] there and they fought rigorously[,] fought against the one expert testifying.

And so, you know, there wasn't any allegation that [co-counsel] was ineffective.

On February 4, 2020, the post-conviction court entered an order incorporating the oral findings of fact and conclusions of law announced at the January 29, 2020 hearing and denying post-conviction relief. Although the February 4, 2020 order states that the hearing was on the pro se petition and amended petition, the record on appeal does not include an amended petition.

Petitioner timely appeals.

## Analysis

On appeal, Petitioner claims that he received ineffective assistance of counsel at trial because (1) trial counsel failed to adequately meet with him prior to trial, and (2) trial counsel fell asleep during trial. Petitioner argues that trial counsel "was unprepared for trial and, most egregiously, would have been unprepared to stand up to the rigorous cross-examination of the State absent adequate preparation and case discussion before trial." Finally, Petitioner argues that "[t]he presence and demeanor of trial attorneys is critical, and such a deficient performance no doubt affected the verdict."

## Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2020). Petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.* Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-

conviction court].” *Fields*, 40 S.W.3d at 456. The post-conviction court’s conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

## Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel’s performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997). Additionally, review of counsel’s performance “requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, “counsel’s performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases.” *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). In order to prove that counsel was deficient, the petitioner must demonstrate “that counsel’s acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms.” *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688).

Even if counsel’s performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### *Failure to Prepare Petitioner for Trial*

Petitioner claims that trial counsel was ineffective for failing to “adequately meet with him prior to trial” and adequately prepare Petitioner for his testimony. Trial counsel has a duty to “conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed.” *Baxter*, 523 S.W.2d at 933. “[A] court deciding an

actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

Petitioner claimed that trial counsel only talked to him one time during his twenty-plus pretrial court hearings and one time during his two-year confinement in jail. Co-counsel, who practiced with trial counsel for almost twenty years, testified that it "would be very outside the normal course of business" for trial counsel not to talk to his client during a court hearing. The post-conviction court noted that Petitioner failed to explain what Petitioner "wanted [trial counsel] to come talk to him about" and offered no explanation as to how further preparation would have changed his decision to testify or would have better prepared him to testify. Co-counsel said that he and trial counsel met with Petitioner before Petitioner testified and advised him concerning his right to testify or not testify and that Petitioner made the decision to testify. Petitioner's pretrial confession to the police, in which he admitted that he hit the two-year-old victim "approximately thirteen or fourteen times[,]" presented a formidable obstacle that Petitioner would be required to explain if he chose to testify. Confronted with his statement to the police and the expert medical testimony concerning the cause of the victim's death, Petitioner took the only avenue available to him, which was to claim that his confession was coerced and untrue and that he only told the police that he beat the victim because he was told that "if [he] would 'just lie' and admit to it he would only be charged with manslaughter."

Co-counsel testified that Petitioner's statement to police "was devastating" to the defense and that, in his opinion, "the proof against [Petitioner] was overwhelming." The post-conviction court accredited co-counsel's testimony concerning the overwhelming character of the proof. The post-conviction court concluded that Petitioner failed to show that trial counsel was deficient in preparing him for trial and that additional preparation would not have changed the outcome of the trial. We agree that Petitioner has failed to prove that trial counsel's performance was deficient or that any alleged deficiency prejudiced Petitioner.

### *Claim that Trial Counsel Fell Asleep*

Petitioner claims that "[t]he presence and demeanor of trial attorneys is critical, and such a deficient performance no doubt affected the verdict." In his brief, Petitioner argues that "trial counsel fell asleep during trial" and that "[t]his is certainly deficient performance that was noted by the jury, which must have surely asked, if his attorney does not care, why should we?"

Petitioner must prove all factual allegations by clear and convincing evidence. *Jaco*, 120 S.W.3d at 830. Even assuming counsel's performance was deficient because he fell asleep, there must be proof that the deficiency resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. There is only speculation to support Petitioner's argument that the jury "noted" that counsel fell asleep. Further, even if the jury noted that counsel fell asleep, there is no proof that counsel's falling asleep had an impact on the verdict, especially in light of the accredited testimony of co-counsel that the evidence of guilt was overwhelming. Petitioner has failed to prove that the alleged deficiency prejudiced the defense.

## Conclusion

The judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE